IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>      Respondent,<br><br>    v.<br><br>JOSE LUIS BELETZUY CAJAS,<br><br>      Appellant. | No. 85214-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — José Luís Beletzuy Cajas appeals his conviction for one count of rape in the second degree against his wife, R. He contends that insufficient evidence supports the element of forcible compulsion under RCW 9A.44.050(1)(a). Viewing the evidence in the light most favorable to the State, the record shows that Beletzuy[1] used force to overcome R's resistance and raped her while she was physically compromised and recovering from a serious surgery. Accordingly, we affirm.

FACTS

On September 3, 2020, the State charged Beletzuy with one count of rape in the second degree against his wife, R, and a separate count of assault in the

---

[1] While the charging document, and therefore caption from the trial court, inserts a hyphen between Beletzuy Cajas' patrilineal and matrilineal last names, the record establishes that he signs his name simply as Beletzuy. His method of abbreviation of his last names is consistent with Latinx naming conventions and both the defendant and named victim required the use of Spanish-language interpreters during trial. Accordingly, we decline to utilize the hyphenated version of his name as inconsistent with historical and cultural traditions of Latinx communities and rather refer to the defendant in the manner by which he self-identifies.

fourth degree with sexual motivation against his adult stepdaughter, C, and alleged both were crimes of domestic violence. Thereafter, the State filed an amended information that added three separate counts of rape in the third degree against R. Again, each count was designated as a crime of domestic violence.

Following jury selection and motions in limine, the case proceeded to trial and the parties delivered opening statements on December 19, 2022. R testified to her relationship[2] with Beletzuy and the circumstances that gave rise to the charges against him. The two met approximately 15 years earlier and began dating about 8 years after meeting. Beletzuy moved into R's house after they had been dating for a little under a year and they were soon married. R explained that they had consensual sex two to three times per week during their relationship, which Beletzuy would often initiate either verbally or nonverbally.

When asked whether Beletzuy had nonconsensual sex with her, R said plainly, "Yes." She explained that, to her, nonconsensual sex means that "someone's not ready to have sexual relationships [sic] with the [other] person." R then testified that Beletzuy had nonconsensual sex with her "[v]ery often" during their relationship. According to R, in those instances, Beletzuy "would take off [her] clothes, [they] would struggle, then he would have sexual relationships [sic] with [her] and then [she] would go to sleep." R confirmed that she would tell him no, but she was unable to physically stop him from having sex with her.

R explained that, in 2019 and 2020, she was suffering from a hormonal disorder and began taking medication which lowered her sex drive. During that

---

[2] At the time of the trial, R and Beletzuy were still married, but R had initiated divorce proceedings.

time, however, R said that Beletzuy continued to have sex with her on a regular basis without her consent. She testified in detail about her medical condition and the particular facts underlying each of the charged crimes.[3] The jury returned verdicts of guilty on all counts except for count 4. By way of special verdicts, the jury found that the remaining counts all involved domestic violence and that count 2 was committed with sexual motivation.

Following trial, Beletzuy moved under CrR 7.4(a)(3) to arrest judgment on count 1. He contended that the State failed to prove the element of "forcible compulsion" as required for the crime of rape in the second degree. After taking argument from the parties on the motion, the trial court denied it. The trial court found that the evidence showed forcible compulsion because: R physically and verbally resisted Beletzuy's sexual advances, she was crying and told him that she was in pain, "she was in a weak and debilitated state" so "the forcible compulsion needed would not have been the same as it would [with] somebody who was able-bodied and in possession of their full strength," and the "victim doesn't have to resist continually throughout the process of penetration."[4]

---

[3] Because Beletzuy only appeals from the conviction for rape in the second degree by forcible compulsion in count 1, the facts underlying that count are set out in detail in the analysis section.

[4] Beletzuy does not expressly challenge the trial court's finding of forcible compulsion in its ruling on the defense motion under CrR 7.4(a)(3). The State contends that the unchallenged findings become verities on appeal and cites to *City of Seattle v. Wiggins*, 23 Wn. App. 2d 401, 407, 515 P.3d 1029 (2022).

However, *Wiggins* is distinguishable as that case concerned discretionary review of the superior court's application of the Rules for Appeal for Decisions of Courts of Limited Jurisdiction (RALJ) to a pretrial ruling from the district court on the admissibility of certain evidence. *Id*. at 403. Here, we are faced with a criminal defendant raising a claim of insufficient evidence on direct appeal after a conviction by a jury, which we review de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

At sentencing, Beletzuy moved to vacate the rape in the third degree conviction on count 3 on the basis that it merged with the rape in the second degree conviction on count 1. The trial court granted the motion and dismissed count 3. The court then sentenced Beletzuy to 29 months in prison on count 5, 120 months to life on count 1, and 364 days for count 2, all to run concurrently.

Beletzuy timely appealed.

ANALYSIS

Beletzuy's sole assignment of error goes to his conviction for rape in the second degree on the ground that the State failed to prove the element of forcible compulsion. His position lacks merit.

Due process "requires the State to prove beyond a reasonable doubt all facts necessary to constitute the crime charged." *State v. Hundley*, 126 Wn.2d 418, 421, 895 P.2d 403 (1995). "In assessing the sufficiency of the evidence, the court must view the evidence in the light most favorable to the State and decide whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *State v. Mines*, 163 Wn.2d 387, 391, 179 P.3d 835 (2008). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). While "the existence of a fact cannot rest upon guess, speculation or conjecture," a defendant in this context "admits the truth of the State's evidence and all inferences that reasonably can be drawn from that evidence." *State v. Hutton*, 7 Wn. App. 726, 728, 502 P.2d 1037 (1972); *State v. Colquitt*, 133 Wn. App. 789, 796, 137 P.3d 892 (2006).

An individual is guilty of rape in the second degree when, "under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [b]y forcible compulsion." RCW 9A.44.050(1)(a). The statute defines "forcible compulsion" as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to [themselves] or another person, or in fear that [they] or another person will be kidnapped." RCW 9A.44.010(3).

"Forcible compulsion requires more than the force normally used to achieve sexual intercourse or sexual contact." *State v. Ritola*, 63 Wn. App. 252, 254, 817 P.2d 1390 (1991). In the context of rape in the second degree, "there must have been force that was 'directed at overcoming the victim's resistance and was more than that which is normally required to achieve penetration.'" *State v. Gene*, 20 Wn. App. 2d 211, 224, 499 P.3d 214 (2021) (quoting *State v. McKnight*, 54 Wn. App. 521, 528, 774 P.2d 532 (1989)). "The resistance that forcible compulsion overcomes need not be physical resistance, but it must be reasonable resistance under the circumstances." *Id*.

Here, the evidence is plainly sufficient to show forcible compulsion as defined for purposes of rape in the second degree. R saw a doctor due to stomach pain while she was being treated for her hormonal condition in 2019 and 2020, and was told that she needed abdominal surgery for a hernia. Following the surgery in March 2020, R remained hospitalized for five or six days, longer than the originally anticipated two days, due to the amount of pain she was in from the "incision [that] was made in [her] stomach." She described the incision as approximately three

inches in size and explained that "it starts approximately right below [her] belly button and then it gets almost all the way to [her] private part." The incision was closed with several stitches and covered with a long white "bandage that went all around [her] body."

When she returned home from the hospital, R explained, she was unable to move normally, lift things, or work. She described her pain during that time as a 10 out of 10 on a pain scale and explained that the doctors told her she could not have sex until she recovered. R testified that she was physically weaker than usual for two or three weeks following the surgery. R stated that Beletzuy nonetheless forced her to have sex with him a "little over a week" after she was discharged from the hospital. According to R, on the night of the incident, she was still bandaged from surgery and laying down in the bedroom wearing a nightgown, and Beletzuy laid down next to her and began touching her. R said that she told Beletzuy she was "not feeling well, that it was not the right thing to do," but he did not stop. R recalled Beletzuy touching her breasts and she "pushed his hands away" and "told him that [she] didn't feel well." She remembered telling him that she did not want to have sex and testified that Beletzuy knew that, at that point in her recovery from surgery, the doctor had advised that she was not supposed to have intercourse. R explained that Beletzuy "said just a little bit. That he was going to be gentle and careful." Though she did not change her mind, R explained that Beletzuy got on top of her and "penetrated her gently until he finished." R testified that she tried to push him off of her with her hands when "he was penetrating her" as "he was hurting [her]." She pushed his shoulders but was

- 6 -

unable to push him off.  After attempting to move him off of her, R stated that "[she] let him finish" after concluding that she "didn't have the strength" to push Beletzuy off of her.  R noted that, afterwards, Beletzuy "cleaned [her] up because [she] was not able to clean [herself]."  She scaled her pain as an 8 out of 10 during this incident and recalled that she was crying as it was happening.  Following the incident, R explained that she had to call the doctor as the pain had become "quite worse."

The facts presented at trial clearly establish that R was in a compromised state and her ability to physically resist was greatly diminished as she was still weakened while recovering from surgery.  When the incident occurred, not only was R still wrapped in a bandage with an incision running between her belly button and "private part," but she was also in serious pain and incapable of lifting things or moving normally.  Additionally, the evidence shows that R verbally and physically resisted Beletzuy's advances, but he ignored her expressions of nonconsent, persisted, and overcame her defiance.  When Beletzuy began touching her breasts, R "pushed his hands away" and told him that she did not want to have sex.  Nevertheless, Beletzuy got on top of her and "penetrated her." R then tried to push Beletzuy off of her as "he was hurting [her]."  Though she pushed his shoulders, R was unable to move him off of her.  Only *after* her unsuccessful verbal and physical attempts to get Beletzuy off of her, did she "let him finish."

Viewed in the light most favorable to the State, the evidence establishes that Beletzuy used physical force that overcame R's resistance, which falls

squarely within the definition of forcible compulsion.  RCW 9A.44.010(3).  Though Beletzuy claims the State failed to show that he "used any force beyond what was necessary to have sexual intercourse with [R]," this is simply contradicted by the record and R's detailed testimony of the rape.  Two weeks after a serious surgery, while she was visibly bandaged, physically weak, and in constant pain, R used her diminished strength to resist Beletzuy's advances but it was not enough.  Under these circumstances, and when viewed in the light most favorable to the State, the evidence supports a finding of forcible compulsion and shows that Beletzuy committed rape in the second degree.  *See McKnight*, 54 Wn. App. at 527-28.  Accordingly, we affirm.

Hazel, A.C.J.

WE CONCUR:

Díaz, J.

Birk, J.